JOHN T. JASNOCH (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
Email: jjasnoch@scott-scott.com

THOMAS L. LAUGHLIN, IV
JONATHAN M. ZIMMERMAN
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
Email: tlaughlin@scott-scott.com
        jzimmerman@scott-scott.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CITY OF BIRMINGHAM RELIEF AND RETIREMENT SYSTEM, Derivatively and on Behalf of Nominal Defendant NETFLIX, INC., <br><br> Plaintiff, <br><br> v. <br><br> REED HASTINGS, DAVID WELLS, RICHARD BARTON, A. GEORGE (SKIP) BATTLE, TIMOTHY HALEY, JAY HOAG, LESLIE KILGORE, ANN MATHER, BRAD SMITH, ANNE SWEENEY, NEIL HUNT, TED SARANDOS, GREG PETERS, and DAVID HYMAN, <br><br> Defendants, <br><br> - and - <br><br> NETFLIX, INC., <br><br> Nominal Defendant. | Case No. 3:18-cv-02107 <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Plaintiff City of Birmingham Relief and Retirement System ("City of Birmingham" or "Plaintiff"), by and through its undersigned counsel, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant Netflix, Inc. ("Netflix" or the "Company"), against certain current and former members of Netflix's Board of Directors (the "Board") and executive officers (collectively, "Defendants"), seeking to remedy breaches of fiduciary duties and corporate waste from at least April 2015 through the present (the "Relevant Period").  Plaintiff makes these allegations upon personal knowledge as to the facts of its ownership of Netflix stock and upon the investigation of counsel, which included review and analysis of: (a) documents obtained pursuant to 8 *Del. C.* §220 ("Section 220") (the "220 Documents"); (b) public filings made by Netflix and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by certain of the Director Defendants (defined below) and other related non-parties; (d) news articles, shareholder communications, and postings on Netflix's website concerning the Company's public statements; and (e) other publicly available information concerning Netflix and the Defendants.

# I.   INTRODUCTION AND SUMMARY OF CLAIMS

1.   This is a shareholder derivative action brought on behalf and for the benefit of Netflix against the Director Defendants for breaches of fiduciary duties of loyalty, good faith, and candor arising from the disloyal and dishonest management of Netflix's Performance Bonus Plan (the "Plan"), in order to pay Netflix's top officers unwarranted compensation not justified under 26 U.S.C. §162(m) ("Section 162(m)"), and from the issuance of false and misleading statements concerning the Plan that concealed Defendants misconduct from Netflix shareholders in violation of the federal securities laws.

2.   Netflix is a company that allows subscribers to access a collection of television shows and movies via the internet.  According to its public filings, Netflix has over 93 million streaming members in over 190 countries.

3.   During the Relevant Period, Netflix's Board represented to shareholders in prospectuses regulated by the federal securities laws that, in setting compensation for Netflix's

1  top officers, the Board's Compensation Committee complied with Section 162(m) of the

2  Internal Revenue Code ("I.R.C."), which regulates executive officer compensation.   Under

3  Section 162(m), the Company may not receive a federal income tax deduction for compensation

4  paid to the Company's top officers in excess of $1 million per year.

5      4.    Notwithstanding this general rule, Netflix could receive a federal income tax

6  deduction for compensation exceeding $1 million provided that the compensation qualifies

7  as "performance-based" under Section 162(m).   To qualify as "performance-based," the

8  compensation must, among other requirements, be contingent on the attainment of one or more

9  pre-established, objective performance goals.   Critically, in order for a performance goal to

10  qualify under Section 162(m), its achievement must be "***substantially uncertain***" at the time it

11  is set.

12      5.    In other words, a company may only pay exorbitant, $1+ million per year

13  compensation to an employee and deduct those payments for tax purposes if the payments are

14  tied to that employee achieving real accomplishments that serve the Company and its

15  shareholders.   As a top 10 shareholder of Netflix was quoted in the media saying, "'[t]he

16  intellectual framing of a bonus is that you're targeting 'stretching goals' that you get paid for

17  delivering[.]  . . .  Your salary is what you get paid for doing a good job when you come to

18  work. The stretch is the bonus.'"

19      6.    ███████████████████████████

20  █████████████████████████████████████

21  ████████████████████     ████████████████

22  █████████████████████████████████████

23  █████████████████████████████████████

24  █████████████████████████████████████

25  █████████████████████████████████████

26  █████████████████████████████████████

27  █████████████████████████████████████

28  █████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 ████████████████████████████████████████████████

2 ████████████████████████████████████

3        7.       By July 2017, Netflix's top officers had hit their target squarely in seven out of

4 eight quarters, missing by just one percentage point in the other quarter. This artificial precision

5 resulted in the Company paying these officers approximately $18.73 million out of a target pool

6 of $18.75 million.

7        8.       On July 18, 2017, citing such "uncanny accuracy," the *Financial Times* ran an

8 article, entitled "Netflix Executives Keep Hitting Bonus Bullseyes," reporting that investors and

9 tax experts had begun questioning whether Netflix's targets were a *fait accompli*, as opposed to

10 legitimate performance goals. In fact, as described further below, the record shows that the

11 *Financial Times* "hit the nail on the head." Through their conduct, Defendants rigged the

12 compensation process, guaranteeing Netflix officers huge cash payments while misleading

13 investors into believing that these payments were justified by attainment of real performance

14 goals.

15        9.       Netflix's Board has not, and will not, commence litigation against the Director

16 Defendants named in this Complaint, nor will they vigorously prosecute such claims, because

17 they face a substantial likelihood of liability for their misconduct. Additionally, the Director

18 Defendants face a substantial likelihood of liability to Netflix for failing to correct and/or

19 implement the necessary internal controls to prevent the harm to the Company that has

20 occurred, or is likely to occur, once the truth about their tax scheme is revealed. Accordingly, a

21 pre-suit demand upon the Board is a useless and futile act. Thus, Plaintiff rightfully brings this

22 action on Netflix's behalf.

23 **II.     JURISDICTION AND VENUE**

24        10.      This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of

25 Civil Procedure.

26        11.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because

27 the claims asserted arise under §§14(a) and 29(b) of the Securities Exchange Act of 1934 (the

28 "Exchange Act") (15 U.S.C. §§78n(a) and 78cc(b)).

12.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has personal jurisdiction over each Defendant because each Defendant has committed acts related to the claims at issue in this Complaint within this District.

14.     Venue is proper in this District because Nominal Defendant Netflix is headquartered in this District, in Los Gatos, California, and a number of the Director Defendants are citizens of the State of California.  Additionally, venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.

## III.   PARTIES

15.     Plaintiff City of Birmingham Relief and Retirement System is a shareholder of Netflix and has continuously held its shares at all times relevant hereto.  Plaintiff is a domestic entity located in Jefferson County, Alabama.

16.     Nominal Defendant Netflix is a Delaware corporation with its principal executive offices located at 100 Winchester Circle, Los Gatos, California 95032.  The Company has three reportable segments: (1) Domestic Streaming; (2) International Streaming; and (3) Domestic DVD.  The Domestic Streaming segment derives revenues from monthly membership fees for services consisting solely of streaming content to Netflix members in the United States, while the International Streaming segment derives revenues from monthly membership fees for services consisting solely of streaming content outside the United States. The Domestic DVD segment derives revenues from monthly membership fees for services consisting solely of DVD-by-mail.  Global streaming revenues are calculated by combining revenues from each of these three reporting segments.

17.     Defendant Reed Hastings ("Hastings") co-founded Netflix in 1997, is the Chief Executive Officer ("CEO"), and has served as Chairman of the Board since its inception. Defendant Hastings was aware that Netflix's Performance Bonus Plan was rigged, yet caused

the Company to disseminate false and misleading Proxy Statements concealing the truth in 2015, 2016, and 2017. Per Netflix's Proxy Statements, Hastings was not deemed "independent" under the applicable rules of the SEC and NASDAQ.

18.     Defendant David Wells ("Wells") has served as the Company's Chief Financial Officer ("CFO") since 2010. Defendant Wells first joined Netflix in 2004, serving in a variety of planning and analysis roles, including, most recently, as the Vice President of Financial Planning & Analysis. In his capacity as CFO, Defendant Wells knew, or should have known, that the Company's public statements concerning its executive compensation concealed the fact that the Company's performance-based bonus plan did not comply with Section 162(m). Despite this knowledge, Defendant Wells caused Netflix to disseminate false and misleading Proxy Statements concealing the truth in 2015, 2016, and 2017.

19.     Defendant Richard Barton ("Barton") has served as a director of the Company since May 2002. Defendant Barton currently serves on the Board's Audit Committee, as well as on its Nominating & Governance Committee. Defendant Barton has served on the Audit Committee, continuously, since 2012. Aware that the Company's performance-bonus plan was rigged, Defendant Barton caused the Company to disseminate false and misleading Proxy Statements in 2015, 2016, and 2017.

20.     Defendant A. George (Skip) Battle ("Battle") has served as a director of the Company since June 2005 and as a member of the Board's Compensation Committee, continuously, since 2008. As a member of the Compensation Committee, Defendant Battle rigged the compensation process in favor of Netflix's top officers and against the interest of Netflix shareholders as described herein. Defendant Battle also caused the Company to disseminate false and misleading Proxy Statements in 2015, 2016, and 2017.

21.     Defendant Timothy Haley ("Haley") has served as a director of the Company since 1998 and has been on the Board's Compensation Committee, continuously, since 2003, serving as its Chair from at least 2015. As a member of the Compensation Committee, Defendant Haley rigged the compensation process in favor of Netflix's top officers and against

the interest of Netflix shareholders as described herein.  Defendant Haley also caused the Company to disseminate false and misleading Proxy Statements in 2015, 2016, and 2017.

22.     Defendant Jay Hoag ("Hoag") has served as a director of the Company since 1995 and as a member of the Board's Compensation Committee, continuously, since 2003.  As a member of the Compensation Committee, Defendant Hoag rigged the compensation process in favor of Netflix's top officers and against the interest of Netflix shareholders as described herein. Defendant Hoag also caused the Company to disseminate false and misleading Proxy Statements in 2015, 2016, and 2017.

23.     Defendant Leslie Kilgore ("Kilgore") served as the Company's Chief Marketing Officer from 2000 until 2012, before joining the Board in January 2012.  Aware that the Company's performance-bonus plan was rigged, Defendant Kilgore caused the Company to disseminate false and misleading Proxy Statements in 2015, 2016, and 2017.

24.     Defendant Ann Mather ("Mather") has served as a director of the Company since 2010 and as Chair of the Audit Committee, continuously, since 2011.  Aware that the Company's performance-bonus plan was rigged, Defendant Mather caused the Company to disseminate false and misleading Proxy Statements in 2015, 2016, and 2017.

25.     Defendant Brad Smith ("Smith") has served as a director of the Company since March 2015.  Aware that the Company's performance-bonus plan was rigged, Defendant Smith caused the Company to disseminate false and misleading Proxy Statements in 2015, 2016, and 2017.

26.     Defendant Anne Sweeney ("Sweeney") has served as a director of the Company since March 2015.  As a member of the Compensation Committee, Defendant Sweeney rigged the compensation process in favor of Netflix's top officers and against the interest of Netflix shareholders as described herein.  Defendant Sweeney also caused the Company to disseminate false and misleading Proxy Statements in 2015, 2016, and 2017.

27.     Defendants Hastings, Barton, Battle, Haley, Hoag, Kilgore, Mather, Smith, and Sweeney are collectively referred to herein as the "Director Defendants."

28.   Defendants Hastings, Wells, Barton, Battle, Haley, Hoag, Kilgore, Mather, Smith, and Sweeney are collectively referred to herein as the "Individual Defendants."

29.   Defendants Battle, Hoag, and Haley are collectively referred to herein as the "Compensation Committee Defendants."

30.   Defendant Neil Hunt ("Hunt") had been with Netflix since 1991 until his announced resignation, effective July 2017.  Formerly the Company's Chief Product Officer, Defendant Hunt was responsible for leading the product team, which designs, builds, and optimizes the Netflix experience.  Defendant Hunt benefited from the rigged compensation process alleged herein – which favored Netflix's top officers rather than the interests of Netflix shareholders – reaping proceeds in excess of $12.6 million.

31.   Defendant Ted Sarandos ("Sarandos") is Netflix's Chief Content Officer, having led content acquisition for Netflix since 2000.  Defendant Sarandos benefited from the rigged compensation process alleged herein – which favored Netflix's top officers rather than the interests of Netflix shareholders – reaping proceeds in excess of $10.5 million.

32.   Defendant Greg Peters ("Peters") currently serves as the Company's Chief Product Officer, having been named as Defendant Hunt's successor upon news of his resignation.  Previously, Defendant Peters served as both the International Development Officer for Netflix, responsible for speeding Netflix's international growth and establishing local operations and partnerships, and Chief Streaming and Partnerships Officer.  Defendant Peters benefited from the rigged compensation process alleged herein – which favored Netflix's top officers rather than the interests of Netflix shareholders – reaping proceeds in excess of $3.2 million.

33.   Defendant David Hyman ("Hyman") is General Counsel for Netflix, responsible for all legal and public policy matters for the Company.  Defendant Hyman has served in this capacity since 2002 and also serves as the Board's Secretary.  Upon information and belief, Defendant Hyman benefited from the rigged compensation process alleged herein – which favored Netflix's top officers rather than the interests of Netflix shareholders – reaping proceeds of approximately $800,000.

34.     Defendants Hunt, Sarandos, Peters, and Hyman are referred to herein as the "Executive Officer Defendants."

## IV.     DEFENDANTS' FIDUCIARY DUTIES AND BREACHES THEREOF

35.     By reason of their positions as directors and fiduciaries of Netflix, and by virtue of their ability to control the business and corporate affairs of the Company, each Director Defendant owed, and owes, Netflix and its shareholders fiduciary obligations of trust, loyalty, good faith, and candor and were, and are, required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner.   The Director Defendants were, and are, required to act in furtherance of the best interests of Netflix and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

36.     Each Director Defendant owes to Netflix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets, and in the highest obligations of fair dealing.

37.     At all times relevant hereto, each Individual Defendant was the agent of each of the other Director Defendants, and of the Company, and was at all times acting within the course and scope of such agency.

38.     By virtue of their fiduciary duties of loyalty, good faith, trust, and candor, each Individual Defendant was required to, among other things:

a.      exercise good faith to ensure that Netflix's affairs were conducted in an efficient, business-like manner;

b.      exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

d.     remain informed as to how the Company conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

39.     The Director Defendants, who were, and are, members of the committees of Netflix's Board, assumed the responsibility to carry out the functions of their committees.

40.     The Director Defendants knowingly or consciously breached their fiduciary duties of loyalty and good faith. They did so by rigging Netflix officers' bonus payments in order to guarantee that Netflix would pay more than $27 million in unnecessary cash payments and by misleading Netflix investors about both the way in which executive compensation was calculated and the potential tax liability incurred under Section 162(m).

41.     By virtue of their positions of control and authority as directors and/or officers of Netflix, the Director Defendants were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

42.     Furthermore, by ordering Netflix's General Counsel, Defendant Hyman, to sign and issue Netflix's misleading 2015, 2016, and 2017 Proxy Statements on SEC Form 14-A, the Director Defendants breached their fiduciary duty and the federal securities law.

## V.     NETFLIX'S CORPORATE GOVERNANCE STRUCTURE & REQUIREMENTS

43.     Netflix's bylaws, articles of incorporation, corporate governance guidelines, and Code of Conduct, as well as Board committee charters, specifically set forth additional duties and obligations that Netflix's Board members are required to fulfill on behalf of the Company.

### A.     Netflix's Code of Ethics

44.     Netflix maintains a Code of Ethics,[1] which applies to directors, officers and other employees at the Company. Section III of the Code of Ethics is entitled "**Disclosure**" and states

---

[1]     Netflix, Inc., *Code of Ethics*, https://ir.netflix.com/static-files/086b12ac-d05d-410d-9b86-73cc6ea35e35.

that "Senior Financial Officers," which includes the principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, are "responsible for ensuring that the disclosure in the Company's periodic reports is full, fair, accurate, timely and understandable." *Id.* at 1 [emphasis in original].   More specifically:

> Senior Financial Officers shall take such action as is reasonably appropriate to (i) establish and comply with disclosure controls and procedures and accounting and financial controls that are designed to ensure that material information relating to the Company is made known to them; (ii) confirm that the Company's periodic reports comply with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (iii) ensure that information contained in the Company's periodic reports fairly presents in all material respects the financial condition and results of operations of the Company.

> Senior Financial Officers will not knowingly (i) make, or permit or direct another to make, materially false or misleading entries in the Company's, or any of its subsidiary's, financial statements or records; (ii) fail to correct materially false and misleading financial statements or records; (iii) sign, or permit another to sign, a document containing materially false and misleading information; or (iv) falsely respond, or fail to respond, to specific inquiries of the Company's independent auditor or outside legal counsel.

*Id.*

45.     In addition, §IV of the Code of Ethics is entitled "**Compliance**" and provides the following:

> It is the Company's policy to comply with all applicable laws, rules and regulations. *It is the personal responsibility of each Netflix Party* to adhere to the standards and restrictions imposed by those laws, rules and regulations, and in particular, those relating to accounting and auditing matters.

*Id.* [emphasis added in bold and italics].

**B.     Additional Responsibilities Based on Board Committee Membership**

46.     Netflix has four standing committees of the Board, two of which are relevant here: (1) the Compensation Committee; and (2) the Audit Committee.   Importantly, both committees were required, pursuant to their charters, to report regularly to the full Netflix Board. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

47.    According to the Company's 2016 Proxy Statement, the Audit Committee "met seven times in 2015" and each committee member "attended at least 75%" of those meetings, while the Compensation Committee "held two meetings in 2015" with full participation and attendance.  The Company's 2017 Proxy Statement similarly stated that the Audit Committee, again, "met seven times" with its members attending "at least 75%" of its meetings, while the entire Compensation Committee met three times during 2016.

48.    According to the Compensation Charter,[2] "[t]he Company's philosophy in setting its compensation policies for executive officers is to attract and retain key executive talent that maximizes shareholder value over time."  *Id.* at 1.  To achieve that end, Netflix's Compensation Committee is charged with "review[ing] and approv[ing] all forms of compensation to be provided to the executive officers and directors of the Company."  *Id.* Specifically, the Compensation Committee is responsible for:

---

[2]    Netflix, Inc., *Charter for the Compensation Committee of the Board of Directors of Netflix, Inc.*, https://ir.netflix.com/static-files/2370482f-3b80-46e2-9523-43a584ba65cc   (the "Compensation Charter").

1
2

> Reviewing and approving the compensation and compensation policy for executive officers of the Company, and such other employees of the Company as directed by the Board;

3

> * * *

4
5

> Acting as the administrator (with all powers specified in the applicable plan) of each of the Company's (i) 2002 Employee Stock Purchase Plan, (ii) 2002 Stock Plan, (iii) 2011 Stock Plan, (iv) Performance Bonus Plan and (v) such other plans as may be enacted by the Company[; and]

6
7

> * * *

8
9
10

> Preparing a report (to be included in the Company's proxy statement) which describes: (i) that the Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis with management and (ii) that based on the review and discussions, the Compensation Committee recommended to the Board that the Compensation Discussion and Analysis be included in the Proxy Statement and incorporated into the Company's Annual Report[.]

11

*Id.* at 2.

12          49.     According to the Company's Audit Charter,[3] the Audit Committee is charged

13   with the "oversight and monitoring of the (i) Company's accounting and financial reporting

14   process and policies, (ii) . . . systems of internal controls over financial reporting, (iii) integrity

15   of the Company's financial statements, (iv) audits of the Company's financial statements and

16   (v) the independent auditors' qualifications, independence and performance[.]"  *Id.* at 1.  The

17   Audit Committee also "assists the Board in ensuring the Company's compliance with legal and

18   regulatory requirements in connection with the Company's financial reporting process."  *Id.*

19   Among other responsibilities, the Audit Committee is expressly charged with:

20
21

> Reviewing on a continuing basis the adequacy and effectiveness of the Company's system of internal controls over financial reporting as well as the Company's disclosure controls and procedures;

22

> * * *

23
24

> Reviewing before release the unaudited quarterly and audited annual operating results in the Company's quarterly and annual earnings releases;

25

> * * *

26
27

> Reviewing with management, before release, the audited financial statements and Management's Discussion and Analysis of Financial Condition and Results of Operations included in the Company's Annual Report on Form 10-K, and

28

---

[3]     Netflix, Inc., *Charter for the Audit Committee of the Board of Directors of Netflix, Inc.*, https://ir.netflix.com/static-files/2370482f-3b80-46e2-9523-43a584ba65cc (the "Audit Charter").

recommending to the Board following such review, if appropriate, that the audited financial statements be included in such Annual Report on Form 10-K[; and]

\* \* \*

Reviewing, in conjunction with legal counsel, any legal matters that could have a significant impact on the Company's financial statements.

*Id.* at 2-3.

## VI.   SUBSTANTIVE ALLEGATIONS

### A.   Background on Section 162(m) and the Plan

50.     Section 162(m) subjects publicly held corporations, such as Netflix, to special restrictions concerning the compensation paid to a "Covered Employee."  A Covered Employee consists of a company's CEO and the other three most highly compensated executives of the company, not including the CFO.

51.     Whereas Section 162(a) generally allows a publicly held corporation to take an income tax deduction for "a reasonable allowance for salaries or other compensation for personal services actually rendered" (I.R.C. §162(a)(1)) by its employees, Section 162(m) provides that compensation in excess of $1 million paid by a publicly held corporation to a Covered Employee is generally not tax-deductible.

52.     The statute, however, provides an exception to this rule.  The IRC provides, in relevant part, for the deductibility of remuneration to an applicable employee:

only if—
    (i) the performance goals are determined by a compensation committee of the board of directors of the taxpayer which is comprised solely of 2 or more outside directors,
    (ii) the material terms under which the remuneration is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of such remuneration, and
    (iii) before payment of such remuneration, the compensation committee referred to in clause (i) certifies that the performance goals and other material terms were in fact satisfied.

I.R.C. §162(m)(4)(C).

53.     Likewise, the Treasury Regulations elaborate on the exception for the $1 million deduction limit under Section 162(m) when a compensation plan meets certain criteria for *qualified performance-based* compensation.  *See* 26 C.F.R. §1.162-27(e).

54.     The Treasury Regulations require:

Qualified performance-based compensation must be paid solely on account of the attainment of one or more preestablished, objective performance goals. A performance goal is considered preestablished if it is established in writing by the compensation committee not later than 90 days after the commencement of the period of service to which the performance goal relates, ***provided that the outcome is substantially uncertain at the time the compensation committee actually establishes the goal***. However, in no event will a performance goal be considered to be preestablished if it is established after 25 percent of the period of service (as scheduled in good faith at the time the goal is established) has elapsed.

26 C.F.R. §1.162-27(e)(2)(i) [emphasis added].

55.     The $1 million deduction limit and performance-based exception were enacted by Congress to prevent excessive compensation and to align the performance incentives of certain company executives with the interests of shareholders.   As the Joint Committee of Taxation said, "[t]he $1 million deduction limitation reflects corporate governance issues regarding excessive compensation, rather than issues of tax policy."   JOINT COMM. ON TAXATION, REPORT OF INVESTIGATION OF ENRON CORPORATION AND RELATED ENTITIES REGARDING FEDERAL TAX AND COMPENSATION ISSUED AND POLICY RECOMMENDATIONS, JCS-3-03 NO 16, 2003 WL 25599037, at *133, 133 n.2211 (Feb. 2013).

56.     

57.     On April 28, 2014, the Director Defendants caused the Company to file a Proxy Statement on Form DEF 14A with the SEC (the "2014 Proxy"), which asked shareholders to approve a "Performance Bonus Plan" under which the Board "may provide compensation to eligible employees based upon the Company achieving certain performance goals."   In describing the purpose behind the Plan, the 2014 Proxy explained that "the Plan could permit us to receive a full federal income tax deduction for compensation (if any) paid under the Plan."

58.     The 2014 Proxy described the Plan further, stating, in relevant part:

Under the Plan, the [Compensation] Committee assigns each participant a target award and performance goal or goals for a performance period set by the [Compensation] Committee. The participant's target award typically will be expressed as a dollar amount or as a percentage of his or her base salary.

Each performance period will last from one to twelve fiscal quarters (in other words, each performance period will be no shorter than approximately three months nor longer than approximately thirty-six months), as determined by the [Compensation] Committee. More than one performance period may exist at any one time and the performance periods may vary in length. However, no individual may participate in more than four performance periods at any one time.

For each performance period, the [Compensation] Committee will specify one or more performance goal(s) that must be achieved before an award actually will be paid to the participant for that performance period. The performance goals set by the [Compensation] Committee may require the achievement of objectives for one or more of:

- Revenue
- Subscriber metrics, including net and gross subscription additions, total membership as well as retention
- Profit, including contribution profit
- Margins, including contribution margins
- Cash Flow
- Technology advances and innovations
- Brand or product recognition or awards
- Stock price

The [Compensation] Committee may choose to set target goals: (1) in absolute terms, (2) in relative terms (including, but not limited to, the passage of time, historical results, and/or against other companies or financial metrics), (3) on a per share and/or per capita basis, (4) against the performance of the Company as a whole or against particular business units, lines or products of the Company, (5) on a pre-tax or after-tax basis, and/or (7) on a GAAP (generally accepted accounting principles) or non-GAAP basis. Performance goals may differ from participant to participant, from performance period to performance period and from award to award. The Committee also will determine whether any element(s) (for example, the effect of mergers or acquisitions) will be included in or excluded from the calculations (whether or not such determinations result in any performance goal being measured on a basis other than GAAP).

59.     On June 10, 2014, Netflix announced in a Form 8-K filed with the SEC that the Company's shareholders, on June 9, 2014, approved the adoption of the Plan.  In addition, Netflix summarized the principle features of the Plan and its operation, restating, in substantial part, the description provided to shareholders in the 2014 Proxy.

60.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████████

4     61.   ███████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8 █████████████████████

**B.  Individual Defendants Withheld Material Information from Shareholders in Each of the Companies Next Three Proxies in Violation of Their Fiduciary Duties and the Federal Securities Laws**

62.  On April 27, 2015, all of the directors on the Board caused Netflix to issue a false and misleading proxy statement in connection with the 2015 Annual Shareholders Meeting that was held on June 9, 2015 (the "2015 Proxy"), at which Netflix's shareholders were to vote on the election of three nominees for the Board listed in the 2015 Proxy, including Defendants Barton, Smith, and Sweeney.  The 2015 Proxy was signed by Defendant Hyman "by order of the Board of Directors."

63.  In violation of §14(a) of the Exchange Act, the 2015 Proxy contained materially false and misleading statements and omissions.

64.  The 2015 Proxy misleadingly represented that Netflix planned, beginning in 2015, to award the Executive Officer Defendants "performance-based" bonus compensation under the Plan that purportedly complied with Section 162(m), stating, in relevant part:

> Additionally for 2015, certain of the Named Executed Officers [*i.e.*, the Executive Officer Defendants] participate in the Company's Performance Bonus Plan (the "Plan"). As discussed below, salary for each Named Executive Officer, other than the Chief Financial Officer, that is over $1 million has a substantial surcharge to the Company under IRS rule 162(m). ***In order to comply with 162(m),*** the Company created, and the stockholders approved, the Plan and the Company has implemented it for those whose salary the Company wants to cap at $1 million to avoid the surcharges. For 2015, the Named Executive Officers, except for the Chief Executive Officer and Chief Financial Officer, will participate in the Plan.

[Emphasis added.]

65.  In addition, the 2015 Proxy misleadingly provides:

Section 162(m) generally disallows a tax deduction for compensation that we pay to our Chief Executive Officer or any of the next three most highly compensated executive officers (excluding the Chief Financial Officer) to the extent that the compensation for any such individual exceeds $1 million in any taxable year. However, this deduction limitation does not apply to compensation that is "performance-based" under Section 162(m).

For 2015, the Compensation Committee chose to implement the Performance Bonus Plan that was approved by stockholders in 2014. Under this Plan, certain Named Executives Officers [*i.e.*, the Executive Officer Defendants] will be eligible to receive bonuses based on targets set by the Compensation Committee. In 2015, Messrs. Hunt, Sarandos and Peters may receive compensation under the Performance Bonus Plan, as described above.

66.     These statements were false and misleading at the time they were made in the absence of the disclosure that the bonuses the Individual Defendants anticipated paying the Executive Officer Defendants purportedly under the Plan were, in fact, not "performance-based" and, therefore, non-compliant with Section 162(m) because the targets for each reporting period would be set to amounts the Individual Defendants knew the Company was substantially certain to achieve.

67.     On April 27, 2016, all of the directors on the Board caused Netflix to issue a false and misleading proxy statement in connection with the 2016 Annual Shareholders Meeting that was held on June 9, 2016 (the "2016 Proxy"), at which Netflix's shareholders were to vote on the compensation of its named executive officers and the election of three nominees for the Board listed in the 2016 Proxy, including Defendants Haley, Kilgore, and Mather.  The 2016 Proxy was signed by Defendant Hyman "by order of the Board of Directors."

68.     In violation of §14(a) of the Exchange Act, the 2016 Proxy contained materially false and misleading statements and omissions.

69.     The 2016 Proxy misleadingly represented that the Compensation Committee chose substantially uncertain global streaming revenue goals for each performance period under the Plan, which was intended to allow the Company to fully deduct the bonuses awarded to the Executive Officer Defendants, stating, in relevant part:

As described above, the Committee determined that the maximum annual salary payable to any Named Executive Officer (excluding Mr. Wells) for 2015 would be $1 million. ***Any portion of a Named Executive Officer's compensation that was not allocated to stock options or salary was paid to the Named Executive Officer pursuant to our Performance Bonus Plan (the "Plan")***, which was approved by shareholders at our 2014 Annual Meeting. ***The Plan is intended to***

- 17 -

***permit the Company to seek a full federal tax deduction for compensation paid under the Plan***, compensation that otherwise might not be fully tax deductible to the Company if paid as salary.

* * *

For 2015, the Compensation Committee approved four performance periods. Each performance period was comprised of one of our fiscal quarters so that, in effect, one performance period always was in effect during 2015. There were three participants in each performance period, namely Mr. Sarandos, Mr. Hunt and Mr. Peters. ***For each performance period, the Committee chose a target bonus for each participant and goal for the Company's global streaming revenue for that quarter***, as calculated under generally accepted accounting principles and reflected in our publicly-available financial statements. ***The Committee chose this goal because global streaming revenue is an important metric demonstrating growth of the Company***.

[Emphasis added.]

70.     In addition, the 2016 Proxy misleadingly published the following table, which characterizes each quarter's global streaming revenue figures as being "performance goals":

| Performance Goals by Quarter | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Goal for Global Streaming Revenue (in thousands) | $   1,398,000 | $   1,474,000 | $   1,593,000 | $   1,667,000 |
| Actual Global Streaming Revenue (in thousands) | 1,399,929 | 1,480,676 | 1,580,831 | 1,672,338 |
| % of Goal Achieved | 100% | 100% | 99% | 100% |
| % of Target Bonus Earned | 100% | 100% | 99% | 100% |

71.     Likewise, the 2016 Proxy misleadingly represented that the bonuses issued were "performance-based" under Section 162(m), stating, in relevant part: "[t]he Company's stock options grants are intended to qualify as performance-based under Section 162(m). ***Similarly, bonuses earned and paid under the Performance Bonus Plan are intended to qualify as performance-based***. Amounts paid as salary do not qualify as performance-based." [Emphasis added.] The Individual Defendants then caused Netflix to publish the following table showing the "bonuses" purportedly paid under the Plan to the Executive Officer Defendants:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Name and Position | Q1 | Q2 | Q3 | Q4 | 2015 |
|---|---|---|---|---|---|
| **Neil Hunt** | | | | | |
| Target Bonus | $ 1,250,000 | $ 1,250,000 | $ 1,250,000 | $ 1,250,000 | $ 5,000,000 |
| Actual Bonus | 1,250,000 | 1,250,000 | 1,237,500 | 1,250,000 | 4,987,500 |
| Greg Peters | | | | | |
| Target Bonus | | 250,000 | 250,000 | 250,000 | 250,000 | 1,000,000 |
| Actual Bonus | | 250,000 | 250,000 | 247,500 | 250,000 | 997,500 |
| **Ted Sarandos** | | | | | |
| Target Bonus | | 500,000 | 500,000 | 500,000 | 500,000 | 2,000,000 |
| Actual Bonus | | 500,000 | 500,000 | 495,000 | 500,000 | 1,995,000 |

72. These statements were false and misleading at the time they were made in the absence of the disclosure that the bonuses awarded to the Executive Officer Defendants under the Plan were, in fact, not "performance-based," as required under Section 162(m), because the Individual Defendants set global streaming revenue goals to amounts they knew the Company was substantially certain to achieve, so that the compensation process was rigged and resulted in the overpayment of bonuses.

73. On April 24, 2017, all of the Directors on the Board caused Netflix to issue a false and misleading proxy statement in connection with the 2017 Annual Shareholders Meeting that was held on June 6, 2017 (the "2017 Proxy"), at which Netflix's shareholders were to vote on the compensation of its named executive officers and the election of three nominees for the Board listed in the 2017 Proxy, including Defendants Hasting, Hoag, and Battle. The 2017 Proxy was signed by Defendant Hyman "by order of the Board of Directors."

74. In violation of §14(a) of the Exchange Act, the 2017 Proxy contained materially false and misleading statements and omissions.

75. The 2017 Proxy misleadingly represented that Netflix awarded the Executive Officers Defendants "performance-based" bonus compensation under the Plan, stating, in relevant part:

> As described above, the Committee determined that the maximum annual salary payable to any Named Executive Officer (excluding Mr. Wells) for 2016 would be $1 million. ***Any portion of a Named Executive Officer's compensation that was not allocated to stock options or salary was paid to the Named Executive Officer pursuant to our Performance Bonus Plan (the "Plan")***, which was approved by shareholders at our 2014 Annual Meeting. ***The Plan is intended to permit the Company to seek a full federal tax deduction for compensation paid***

**under the Plan**, compensation that otherwise might not be fully tax deductible to the Company if paid as salary.

* * *

For 2016, the Compensation Committee approved four performance periods. Each performance period was comprised of one of our fiscal quarters so that, in effect, one performance period always was in effect during 2016. There were three participants in each performance period, namely Mr. Sarandos, Mr. Hunt and Mr. Peters. For each performance period, the Committee chose a target bonus for each participant and goal for the Company's global streaming revenue for that quarter, as calculated under generally accepted accounting principles and reflected in our publicly-available financial statements. The Committee chose this goal because global streaming revenue is an important metric demonstrating growth of the Company.

[Emphasis added.]

76.     In addition, the 2017 Proxy misleadingly published the following table, which characterizes each quarter's global streaming revenue figures as being "performance goals":

| Performance Goals by Quarter | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Goal for Global Streaming Revenue (in thousands) | $ 1,813,000 | $ 1,964,000 | $ 2,155,000 | $ 2,344,000 |
| Actual Global Streaming Revenue (in thousands) | 1,812,989 | 1,966,000 | 2,158,000 | 2,351,000 |
| % of Goal Achieved | 100% | 100% | 100% | 100% |
| % of Target Bonus Earned | 100% | 100% | 100% | 100% |

77.     Further, the 2017 Proxy misleadingly represented that the bonuses issued to the Executive Officers Defendants were "performance-based" under Section 162(m), stating, in relevant part: "[t]he Company's stock options grants are intended to qualify as performance-based under Section 162(m). **Similarly, bonuses earned and paid under the Performance Bonus Plan are intended to qualify as performance-based**. Amounts paid as salary do not qualify as performance-based."  [Emphasis added.]  The Individual Defendants then caused Netflix to publish the following table showing the "bonuses" purportedly paid under the Plan to the Executive Officer Defendants:

| Name and Position | Q1 | Q2 | Q3 | Q4 | 2016 |
|---|---|---|---|---|---|
| Neil Hunt | | | | | |
| Target Bonus | $ 1,312,500 | $ 1,312,500 | $ 1,312,500 | $ 1,312,500 | $ 5,250,000 |
| Actual Bonus | 1,312,500 | 1,312,500 | 1,312,500 | 1,312,500 | 5,250,000 |
| Greg Peters | | | | | |
| Target Bonus | 375,000 | 375,000 | 375,000 | 375,000 | 1,500,000 |
| Actual Bonus | 375,000 | 375,000 | 375,000 | 375,000 | 1,500,000 |
| Ted Sarandos | | | | | |
| Target Bonus | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 4,000,000 |
| Actual Bonus | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 4,000,000 |

78.     These statements were false and misleading at the time they were made in the absence of the disclosure that the bonuses awarded to the Executive Officer Defendants under the Plan were, in fact, not "performance-based," as required under Section 162(m), because the Individual Defendants set global streaming revenue goals to amounts they knew the Company was substantially certain to achieve, so that the compensation process was rigged and resulted in the overpayment of bonuses.

**C.     Contrary to the Representations Made in Netflix's Proxy Statements, the Goals Set Under the Plan Were Not "Performance-Based" Because They Were Substantially Certain to Be Achieved**

79.     The Individual Defendants misled shareholders into approving the compensation paid to the Executive Officer Defendants by misleadingly representing that the bonuses were paid for the attainment of substantially uncertain performance goals.   The truth was that Defendants rigged the compensation process and guaranteed executives multi-million dollar windfalls.

80.     ███████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████         █████████████████████████████████████
██████████████████████████████████

81.     ███████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4    95.

5

6

7

8

9

10   96.

11

12

13   97.

14

15

16

17

18   98.

19

20

21

22

23

24

25

26   99.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



105.

106.

107.

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

108.    Plaintiff was a shareholder at the time of the conduct complained of herein and has continuously held shares of Netflix through the present.  Plaintiff will continue to remain a shareholder of Netflix throughout the pendency of this action.  Plaintiff will adequately and fairly represent the interests of Netflix and its shareholders in enforcing its rights.

109.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.  In addition to those allegations, demand on the current Board (comprised of Defendants Hastings, Barton, Battle, Haley, Hoag, Kilgore, Mather, Smith, and Sweeney) would have been a futile act for at least the following reasons as set forth herein.

110.   Such a demand would be a futile and useless act because there is a reasonable doubt that a majority of the current nine-member Board is capable of making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

111.   A majority of the Board has a strong interest in refusing to bring the claims asserted by Plaintiff to protect themselves against a substantial likelihood of liability for violating federal securities and tax laws, which disqualifies them from considering a demand. All nine directors on Netflix's Board sat on Netflix's Board during the Relevant Period and caused Netflix to file false and misleading Proxy Statements in 2015, 2016, and 2017.  As described above, these culpable directors face a substantial likelihood of liability for violating §14(a) of the Exchange Act.  These Proxy Statements harmed both Netflix by interfering with the proper governance of the Company and its shareholders by misleadingly forming the basis of their votes on executive compensation and the re-election of the Company's directors.

112.   Moreover, these nine individuals had an obligation to ensure that Netflix complied with the law that they actively shirked.  Faced with knowledge that Netflix was engaging in a scheme to mischaracterize the bonuses paid out to the Executive Officer Defendants, these nine Director Defendants caused or allowed the Company to continue the misconduct.  Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these nine individuals breached their fiduciary duty of candor by concealing how they determined each performance period's global streaming revenue goal and then deceptively characterized the bonus payouts to the Executive Officer Defendants as being deductible under Section 162(m).   Rather, the Board knew that goals substantially certain to be achieved did not fall under the category of "performance-based" and that Netflix was routinely

1  omitting the truth in its public statements.  Accordingly, these nine individuals are disqualified
2  from evaluating a demand, making issuing a demand upon them futile.

3       113.    Furthermore, as detailed herein, Defendants Battle, Haley, and Hoag served as
4  Compensation Committee members throughout the Relevant Period and were charged with
5  administering the Plan, certifying performance each quarter and setting performance goals for
6  each subsequent performance period. ███████████████████████████
7  ████████████████████████████████████████████████████
8  ████████████████████████████████████████████████████
9  ████████████████████████████████████████████████████
10 ████████████████████████████████████████████████████

11 ████████  Nevertheless, the Compensation Committee Defendants caused Netflix to misrepresent
12 these bonuses as "performance-based" under Section 162(m).  In so doing, Defendants Battle,
13 Haley, and Hoag were instrumental in the misconduct alleged herein, making them incapable of
14 considering a demand with the requisite level of disinterestedness and independence required.
15 Thus, under the facts at bar, demand is excused.

16     114.  ███████████████████████████████████
17 ████████████████████████████████████████████████████
18 ████████████████████████████████████████████████████
19 ████████████████████████████████████████████████████
20 ████████████████████████████████████████████████████
21 ████████████████████████████████████████████████████

22 ████████████████████████  Second, according to the Company's 2017 Proxy, the
23 Board has determined that Defendant Hastings fails to meet the independence rules prescribed
24 by the SEC and NASDAQ's listing standards.  Accordingly, demand is futile with respect to
25 Defendant Hastings.

26     115.  ████████████████████████████████████
27 ████████████████████████████████████████████████████
28 ████████████████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████        Therefore, these Defendants knowingly or recklessly allowed the Company to mislead investors and/or acquiesced to violations of law by Defendants Hastings, Battle, Haley, and Hoag in breach of their duty of candor.

116.    To date, the nine directors have failed to seek to recover for the Company for any of the wrongdoing identified by Plaintiff herein.  For all these reasons, a majority of the current Netflix Board is incapable of independently and fairly evaluating a demand to bring an action against themselves and other Netflix executives.

## VIII.   CAUSES OF ACTION

**FIRST COUNT**
**Violation of §14(a) of the Exchange Act**
**<u>Against All of the Individual Defendants</u>**

117.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

118.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. §240.14a-9(a).

119.    The Individual Defendants exercised control over Netflix and caused Netflix to disseminate the false and misleading Proxy Statements in 2015, 2016, and 2017.  These Proxy Statements materially misrepresented how the Company characterized and paid executive compensation to the Executive Officer Defendants.

120.    As stated herein, these Proxy Statements contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not

1    misleading, in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated

2    thereunder.  These false statements and omissions were essential links in the re-election of each

3    of the directors, formed the basis of the Company's shareholders' "say-on-pay" vote, and the

4    continued mismanagement of Netflix.

5        121.    The written communications made by the Individual Defendants described

6    herein constitute violations of Rule 14a-9 and §14(a) because such communications were

7    materially false and/or misleading and were provided in a negligent manner.

8        122.    At all relevant times to the dissemination of the materially false and/or

9    misleading Proxy Statements, the Individual Defendants were aware of and/or had access to the

10   facts concerning Netflix's award of bonuses purportedly under the Company's performance-

11   based Plan.

12       123.    Netflix, as a result, has been injured by this conduct and is entitled to damages

13   and equitable relief**.**

14                              **SECOND COUNT**
                          **Breach of Fiduciary Duty**
15                          <u>**Against All Defendants**</u>

16       124.    Plaintiff incorporates by reference and realleges each and every allegation set

17   forth above as if fully set forth herein.

18       125.    The Individual Defendants each owe (or owed) Netflix and its shareholders

19   fiduciary duties of loyalty, good faith, candor, trust, and due care in managing the Company's

20   affairs.

21       126.    As detailed above, the Individual Defendants breached their fiduciary duties by

22   permitting Netflix, its directors, and officers to violate federal securities and U.S. tax laws, as

23   well as the Company's own internal governance regulations.

24       127.    As a direct and proximate result of the Individual Defendants' breaches of their

25   fiduciary duties, Netflix has been damaged, not only monetarily, by paying excessive fees to

26   certain executive officers, but also with regard to its corporate image and goodwill, having

27   deceived the market into tolerating higher executive compensation because it was purportedly

28   awarded pursuant to Section 162(m).  In addition, there is a possibility that Netflix will sustain

1   additional monetary and reputational damages should the IRS undertake an investigation into

2   the misconduct alleged herein.  Such damage is certain to include penalties, fines, and other

3   liabilities.

**THIRD COUNT**
**Corporate Waste**
**<u>Against All of the Individual Defendants</u>**

6        128.    Plaintiff incorporates by reference and realleges each and every allegation set

7   forth above as if fully set forth herein.

8        129.    By rewarding the Executive Officer Defendants bonuses predicated on the

9   Company's achievement of performance goals that were substantially certain to be reached,

10   disqualifying them as "performance-based" bonuses under Section 162(m), the Individual

11   Defendants have caused Netflix to waste valuable corporate assets.

12        130.    As a direct and proximate result of the Individual Defendants' corporate waste,

13   Netflix has suffered damages, not only monetarily, but also to its corporate image and goodwill.

14   **IX.**    **REQUEST FOR RELIEF**

15        WHEREFORE, Plaintiff demands judgment, as follows:

16       A.    Finding that a shareholder demand on the Netflix Board would have been a futile

17          and useless act;

18       B.    Finding that the Individual Defendants have breached their fiduciary duties to the

19          Company and its shareholders by violating federal securities and U.S. tax laws and

20          regulations;

21       C.    Against each of the Individual Defendants in favor of Netflix for the amount of

22          damages sustained by Netflix, as a result of the breaches of fiduciary duties by

23          each of the Individual Defendant, as alleged herein, jointly and severally, in an

24          amount to be determined at trial, together with pre- and post-judgment interest at

25          the maximum legal rate allowable by law;

26       D.    Requiring the Individual Defendants to return to Netflix all compensation and

27          remuneration of whatever kind paid by Netflix during the time that they were in

28          breach of the fiduciary duties they owed to Netflix;

1    E.    Directing the Individual Defendants to establish, maintain, and fully fund effective

2    corporate governance and compliance programs to ensure that Netflix's directors,

3    officers, and employees do not engage in wrongful and illegal practices;

4    F.    Granting appropriate equitable and/or injunctive relief to remedy the Individual

5    Defendants' misconduct, as permitted by law;

6    G.    Awarding to Plaintiff the costs and disbursements of this action, including

7    reasonable attorneys' and experts' fees and expenses; and

8    H.    Granting any such other further relief as the Court may deem just and proper.

**X.    JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: April 6, 2018    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

By: /s/ John T. Jasnoch

JOHN T. JASNOCH (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
Email: jjasnoch@scott-scott.com

THOMAS L. LAUGHLIN, IV
JONATHAN M. ZIMMERMAN
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
Email: tlaughlin@scott-scott.com
    jzimmerman@scott-scott.com

*Attorneys for Plaintiff City of Birmingham*
*Relief and Retirement System*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, James D. Love, on behalf of the City of Birmingham Relief and Retirement System, hereby verify that I have authority to authorize, and have authorized, the filing of the attached Verified Shareholder Derivative Complaint.   I have reviewed the Verified Shareholder Derivative Complaint, and the facts therein are true and correct to the best of my knowledge, information, and belief.  I declare under penalty of perjury that the foregoing is true and correct.

Dated: *March 28, 2018*

James D. Love, Assistant City Attorney
City of Birmingham Relief and Retirement System

VERIFICATION