1

2

3            **UNITED STATES DISTRICT COURT**

4           **NORTHERN DISTRICT OF CALIFORNIA**

5                 **SAN JOSE DIVISION**

6

7    CITY OF BIRMINGHAM RELIEF AND          Case No.  18-cv-02107-BLF
     RETIREMENT SYSTEM,
8                                           **ORDER GRANTING PLAINTIFF'S**
                    Plaintiff,              **MOTION FOR FINAL APPROVAL OF**
9                                           **SETTLEMENT AND APPROVAL OF**
             v.                             **AGREED-UPON ATTORNEYS' FEES**
10                                          **AND EXPENSES AND PLAINTIFF'S**
     REED HASTINGS, et al.,                 **INCENTIVE AWARD**
11
                    Defendant.              [Re: ECF 83]
12
           Plaintiff City of Birmingham Relief and Retirement System ("Birmingham") brings this

13   shareholder derivative action on behalf of nominal Defendant Netflix, Inc. ("Netflix") against

14   current and former directors and executive officers for alleged violations of securities laws,

15   breaches of fiduciary duty, and corporate waste as a result of their purported knowledge of an

16   alleged scheme to illegally rig Netflix's performance-bonus compensation plan.  *See generally*

17   Compl., ECF 1.  Before the Court is Birmingham's unopposed motion for final approval of

18   settlement and for approval of attorneys' fees and expenses and Plaintiff's incentive award.  *See*

19   Mot. for Final Appr. ("Mot."), ECF 83.  The Court heard argument on the motion on June 25,

20   2020.  For the reasons discussed below and those stated on the record at the hearing on the motion,

21   the motion is GRANTED.

22   **I.      BACKGROUND**

23          **A.      Facts**

24           Netflix is a company that allows its subscribers to access a collection of television shows

25   and movies via the Internet.  Compl. ¶ 2.  Birmingham alleges that Defendants Reed Hastings,

26   David Wells, Richard Barton, A. George (Skip) Battle, Timothy Haley, Jay Hoag, Leslie Kilgore,

27   Ann Mather, Brad Smith, Anne Sweeney, Neil Hunt, Ted Sarandos, Greg Peters, and David

28

1   Hyman (collectively, "Defendants") received compensation from, or were on the Compensation

2   Committee that developed and approved, a performance-bonus compensation plan (the "Plan").

3   Compl. ¶¶ 17-26, 56-59.

4        The Plan was approved by Netflix's Compensation Committee in March 2014, and

5   shareholders approved the Plan in June 2014.  Compl. ¶¶ 56-59.  The Plan was designed, in part,

6   to permit Netflix to claim a tax deduction for performance-based compensation pursuant to 26

7   U.S.C. § 162(m).  Compl. ¶¶ 56-58.  In general, Section 162(m) precludes tax deductions on

8   compensation of certain high-paid executives in excess of one million dollars.  Compl. ¶¶ 50-51.

9   This one-million-dollar-cap was included in Section 162(m) "to prevent excessive compensation

10  and to align the performance incentives of certain company executives with the interests of

11  shareholders."  Compl. ¶ 55 (quoting JCS-3-03 NO 16, 2003 WL 25599037, at 133 n.2211 (Feb.

12  2013)); *see* H.R. Rep. No. 103-111, at 646 (1993).  Section 162(m) contains an exception for

13  compensation awarded for "the attainment of one or more performance goals," which may be tax

14  deductible.  26 U.S.C. § 162(m)(4)(C); Compl. ¶¶ 52-53.  To be tax deductible, among other

15  things, the performance-based compensation must be determined by a compensation committee,

16  disclosed to shareholders, and approved by a majority of the vote in a separate shareholder vote.

17  26 U.S.C.§ 162(m)(4)(C).  The compensation plan must also be "paid solely on account of the

18  attainment of one or more preestablished, objective performance goals."  26 C.F.R. § 1.162-

19  27(e)(2)(i).  To be preestablished, the performance goal must have been "substantially uncertain at

20  the time the compensation committee actually establishe[d] the goal."  *Id.*

21       The Plan was first implemented in 2015, and Birmingham alleged that the performance

22  goals set by the Compensation Committee and approved by Netflix's Board of Directors were not

23  "substantially uncertain," as required by Section 162(m) to be tax deductible, because the Board

24  received highly accurate quarterly projections of Netflix's global streaming revenue and set goals

25  lower than or substantially similar to the projections.  Compl. ¶¶ 6, 60, 82-107.  After each quarter,

26  the Compensation Committee certified the bonus payments for the prior quarter based on whether

27  Netflix achieved these pre-established goals, and, by July 2017, the Compensation Committee did

28  so for seven out of the eight quarters, with the eighth quarter missing by just one percentage point.

United States District Court
Northern District of California

1  Compl. ¶¶ 7, 8, 70-71, 76-77, 81, 87, 92.

2      In addition, Netflix issued proxy statements between 2015 and 2017 that included

3  information regarding the Plan, and these proxy statements are alleged to be materially false or

4  misleading for characterizing payments under the plan as being compliant with Section 162(m).

5  Compl. ¶¶ 64-66, 69-72, 75-78.  According to Birmingham, the proxies caused shareholders to

6  approve paying more than $27 million in unnecessary bonuses and misled investors about the way

7  in which executive compensation was calculated and the potential tax liability incurred under

8  Section 162(m).  Compl. ¶¶ 40, 111.

9      **B.    Procedural History**

10      On August 17, 2017, Birmingham sent a books and records demand seeking Board-level

11  materials relating to potential wrongdoing concerning the administration of the Plan.  Dec. of

12  Thomas L. Laughlin IV ("Laughlin Decl.") ¶ 12, ECF 84.  Netflix produced certain documents

13  pursuant to this demand, which Birmingham and its counsel reviewed prior to filing the complaint

14  in this action.  Laughlin Decl. ¶ 12.

15      This derivative action was initiated on April 6, 2018, asserting three claims for: (1)

16  violation of § 14(a) of the Securities Exchange Act of 1934 for the allegedly misleading proxies;

17  (2) breach of fiduciary duty for violations of federal securities and tax laws, as well as Netflix's

18  internal governance regulations; and (3) corporate waste for excessive payments made pursuant to

19  the Plan that were not tax deductible.  Compl. ¶¶ 117-30.  On February 13, 2019, the Court

20  granted Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 23.1 with

21  leave to amend for failure to plead demand futility and failure to state a claim upon which relief

22  may be granted.  ECF 46, 47.  On April 30, 2019, Birmingham filed a motion to compel the

23  production of certain documents allegedly being withheld by Netflix and Defendants.  ECF 55.

24  The motion was denied without prejudice because the parties settled the case.  ECF 70.

25      **C.    Settlement Agreement and Notice Plan**

26      The parties began negotiating a possible settlement after the motion to dismiss and while

27  the motion to compel was pending.  Laughlin Decl. ¶ 19.  On October 15, 2019, the parties

28  executed a Memorandum of Understanding, memorializing their agreement-in-principle to resolve

United States District Court
Northern District of California

3

the action, subject to approval by the Board of Directors.  Laughlin Decl. ¶ 20.  On October 28, 2019, the Board unanimously approved the Memorandum of Understanding.  Laughlin Decl. ¶ 20. On March 5, 2020, the parties submitted a stipulation of settlement (the "Settlement").  *See* Laughlin Decl., Ex. A ("Settlement Agr."), ECF 78-1.

Under the Settlement, Netflix and its Board of Directors agreed to implement the following corporate governance enhancements for at least four years:

1. Enhancements of the Disclosure Committee. Netflix currently has a management Disclosure Committee. Netflix agrees that it will maintain the existence of this Committee and that this Committee will take the following affirmative steps wit respect to Netflix's disclosures relating to compensation matters. The Disclosure Committee will: (i) review draft disclosures related to compensation matters in Netflix's proxy (the Compensation Discussion and Analysis section) to ensure, to the extent possible, that the proxy does not inaccurately characterize Netflix's compliance with federal and/or state law and discloses all material information related to compensation to Named Executives Officers and/or directors; (ii) receive input from experienced outside counsel on the draft proxy disclosures and Disclosure Committee's annual report to the full Board; and (iii) issue an annual report to the full Board on the accuracy and completeness of Netflix's compensation proxy disclosures.

2. Enhanced Bonus-Related Disclosures. Netflix's compensation disclosures shall include, to the extent applicable, the following general information with respect to any regular bonuses associated with annual compensation paid or proposed to be paid to Named Executives Officers and/or directors: (i) Netflix's bonus philosophy; (ii) the process by which bonus decisions are made; (iii) significant changes in bonus policies or philosophy; (iv) any material impact of bonus decisions, programs, or payouts on Netflix's financial, legal, and compliance risk; and (v) the justification and reasoning for any bonus awards.

3. Retention of Compensation and Tax Consultant(s). With respect to the use of any regular bonuses associated with annual compensation paid or proposed to be paid to Named Executive Officers and/or directors, the Compensation Committee shall retain an independent compensation and tax consultant(s) (the "Compensation Consultant") to assist the Compensation Committee in carrying out its duties, including identifying possible risks associated with any regular bonuses associated with annual compensation and related disclosures by Netflix. More specifically, the Compensation Consultant will be retained

4

to support the work of the Compensation Committee with respect to evaluation and design of any regular bonuses associated with annual compensation paid or proposed to be paid to Named Executive Officers and/or directors, including providing input on performance measures and targets and compensation methods, conditions and criteria, and quantitative target ranges.

4. <u>Enhancement of General Counsel's Office Related to Legal Advice on Regulatory Compliance</u>. Netflix shall designate a member of the General Counsel's Office (either the general counsel or a deputy) to serve as the designated internal legal counsel with respect to regulatory issues concerning compensation paid to Named Executive Officers and/or directors. The individual so designated will consult with the Compensation Committee on at least an annual basis concerning relevant regulatory issues pertaining to Netflix's compensation paid to Named Executive Officers and/or directors and shall advise the Compensation Committee concerning Netflix's regulatory compliance or advise that additional resources (such as external counsel with relevant expertise) are warranted to ensure Netflix's compliance with applicable regulations.

5. <u>Training for Directors</u>. Netflix will, within 12 months of Settlement approval, provide a training session for the Compensation Committee overseen by Netflix's General Counsel Office that will include, but not be limited to, industry trends in the design of compensation plans, avoidance of legal and regulatory pitfalls in designing and implementing performance plans, methods of stockholder engagement on compensation policies, including the utilization of a "Say-on-Pay" stockholder proxy vote, stockholder evaluation of compensation plans, and other methods of engaging stockholders on Netflix compensation philosophy and policies, as well as peer practices for compensation plans. Netflix also will, within 12 months of Settlement approval, provide a training session to the Board, overseen by Netflix's General Counsel Office, regarding the responsibilities of publicly traded companies and their directors and officers under the Generally Accepted Accounting Principles ("GAAP"), Sarbanes-Oxley Act of 2002, Securities Exchange Act of 1934, Securities Act of 1933, public company reporting and compliance requirements, and other topics that are appropriate for, or of interest to, the compliance of public companies with applicable laws.

6. <u>Additional Compensation-Related Actions</u>. With respect to the use of any regular bonuses associated with annual compensation paid or proposed to be paid to the Named Executive Officers and/or directors, the Compensation Committee shall review the

1

2

> compensation philosophy, compensation metrics and amounts,
> and the results of shareholder Say-on-Pay votes in prior year(s)
> before using any such bonus compensation.

3

Settlement Agr. § 2.1

4

Additionally, under the Settlement, Birmingham, on its own behalf and derivatively on

5

behalf of Netflix; Netflix; and each of Netflix's shareholders solely in their capacity as Netflix

6

shareholders, released all claims asserted in this action or that could have been asserted in this

7

action, and any claims in connection with, based upon, arising out of, or relating to the Settlement,

8

except for claims to enforce the Settlement and claims by Defendants or any other insured to

9

enforce their rights under any contract or policy of insurance.  Settlement Agr. §§ 1.17, 1.22, 4.

10

On May 1, 2020, the Court preliminarily approved the Settlement and method for

11

providing notice.  *See* Order Granting Prelim. Appr. Settlement and Notice ("Prelim. Order"),

12

ECF 82.  The notice process included: (1) disclosing the terms of the Settlement through filing a

13

Form 8-K with the Securities and Exchange Commission ("SEC") and attaching the Court-

14

approved notice; (2) publishing the Court-approved summary notice in *Investors' Business Daily*;

15

and (3) posting a copy of the notice on Netflix's investor relations website.  Settlement Agr. § 3.2.

16

Additionally, the parties separately negotiated an incentive award of $10,000 for

17

Birmingham, and an award of attorneys' fees and expenses of up to $800,000.  Settlement Agr.

18

§ 5.1; Laughlin Decl. ¶ 40.

19

## II.    MOTION FOR FINAL APPROVAL OF SETTLEMENT

20

### A.    Legal Standard

21

"A derivative action may be settled, voluntarily dismissed, or compromised only with the

22

court's approval," Fed. R. Civ. P. 23.1(c), and "Federal Rule of Civil Procedure 23 governs a

23

district court's analysis of the fairness of a settlement of a shareholder derivative action."  *In re*

24

*Hewlett-Packard Co. S'holder Derivative Litig.*, No. 3:12-CV-06003-CRB, 2015 WL 1153864, at

25

*3 (N.D. Cal. Mar. 13, 2015).  Accordingly, "courts considering settlements of derivative actions

26

have generally found cases involving dismissal or compromise under Rule 23(e) of nonderivative

27

cases relevant by analogy."  *In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-CV-

28

United States District Court
Northern District of California

05541-JST, 2020 WL 1786159, at *3 (N.D. Cal. Apr. 7, 2020) (brackets, alterations and internal quotation marks omitted).

Under Rule 23, courts must follow a two-step process in evaluating a settlement in a derivative action.  First, the parties must show "that the court will likely be able to . . . (i) approve the proposal under Rule 23(e)(2)."  Fed. R. Civ. P. 23(e)(1)(B).  That is, a court must make a preliminary determination that the settlement "is fair, reasonable, and adequate" when considering the factors set out in Rule 23(e)(2).  Fed. R. Civ. P. 23(e)(2); *see In re Wells Fargo*, 2020 WL 1786159, at *3.  At the preliminary approval stage, the Court must determine whether the settlement falls "within the range of possible approval."  *In re Tableware Antitrust Litig*., 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (internal quotation marks omitted).  "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge," *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (citation omitted), and "[t]he preliminary determination establishes an initial presumption of fairness," *In re Tableware Antitrust Litig*., 484 F. Supp. 2d at 1079.

Second, if the court preliminarily approves a derivative action settlement, notice "must be given to shareholders or members in the manner that the court orders."  Fed. R. Civ. P. 23.1(c).  The court must then hold a hearing to make a final determination whether the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness," and the Court does not have the ability to delete, modify or substitute certain provisions."  *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1026 (9th Cir. 1998) (internal quotation marks omitted).  In the Ninth Circuit, courts use a multi-factor balancing test to analyze whether a given settlement is fair, adequate and reasonable.  That test includes the following factors:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

United States District Court
Northern District of California

*Id.* at 1026-27; *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (discussing *Hanlon* factors).

"The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). "The proposed settlement need not be ideal"; however, it must be fair and free of collusion. *In re Wells Fargo*, 2020 WL 1786159, at *3; *see Hanlon*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."); *In re Hewlett-Packard*, 2015 WL 1153864, at *3 ("To determine whether a proposed settlement is within the range of possible approval, the Court also ensures it is not the product of fraud or overreaching by, or collusion between, the negotiating parties." (internal quotation marks omitted)).

Recent amendments to Rule 23 require the district court to consider a similar list of factors before approving a settlement, including whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3);

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In the Advisory Committee notes to the amendment, the Advisory Committee states that

1    "[c]ourts have generated lists of factors to shed light" on whether a proposed class-action

2    settlement is "fair, reasonable, and adequate." Advisory Committee Notes to 2018 Amendments,

3    Fed. R. Civ. P. 23(e)(2) ("2018 Advisory Notes").  The notes of the Advisory Committee explain

4    that the enumerated, specific factors added to Rule 23(e)(2) are not intended to "displace" any

5    factors currently used by the courts, but instead aim to focus the court and attorneys on "the core

6    concerns of procedure and substance that should guide the decision whether to approve the

7    proposal." *Id*.; *cf. United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002) ("[T]he Advisory Committee

8    Notes provide a reliable source of insight into the meaning of a rule . . . .").  Accordingly, the

9    Court applies the framework set forth in Rule 23 with guidance from the Ninth Circuit's

10   precedent, bearing in mind the Advisory Committee's instruction not to let "[t]he sheer number of

11   factors" distract the Court and parties from the "central concerns" underlying Rule 23(e)(2).

      **B.**    **Discussion**

12

        **1.  Adequacy of notice**

13

14      "Adequate notice is critical to court approval of a class settlement under Rule 23(e)."

15   *Hanlon*, 150 F.3d at 1025.  "In determining the appropriate notice method, the Court considers

16   whether such notice would be sufficient to reach the majority of interested stockholders."  *In re*

17   *Wells Fargo*, 2020 WL 1786159, at *3 (internal quotation marks omitted).

18      The Court previously approved the proposed notice procedure.  Prelim. Order ¶¶ 4-5.  In

19   its motion for final approval, Plaintiff's counsel indicated that the notice plan was followed: on

20   May 11, 2020, Netflix caused the summary notice to be published in *Investor's Business Daily*,

21   *see* Decl. of Lori Will ("Will Decl.") ¶ 4, ECF 85; Will Decl., Ex. B, ECF 86-2; on May 15, 2020,

22   Netflix filed a Form 8-K with the SEC and attached the notice, *see* Will Decl. ¶ 3; Will Decl.,

23   Ex. A, ECF 86-1; and on May 15, 2020, Netflix posted the notice on its investor relations website,

24   *see* Will Decl. ¶ 5; Will Decl., Ex. C, ECF 86-3.  Additionally, the notice was posted on the

25   website of Plaintiff's counsel.  *See* ECF 87, at ¶ 3; ECF 87-1.  The deadline for objections to the

26   Settlement was June 4, 2020, and neither Birmingham nor Plaintiff's counsel has received any

27   objections.  *See* ECF 85.

28      Given these efforts, the Court concludes that the parties have satisfied Rule 23.1 and due

United States District Court
Northern District of California

process.  *See In re Wells Fargo*, 2020 WL 1786159, at *4 (approving settlement where notice involved filing Form 8-K and attaching the notice; publishing summary notice in newspapers, including *Investor's Business Daily*; and posting notice on unique page of company website); *Bushansky v. Armacost*, No. 12-CV-01597-JST, 2014 WL 2905143, at *6 (N.D. Cal. June 25, 2014) (collecting cases).

### 2.   Rule 23(e)/*Hanlon* factors

The Court now considers the factors articulated in *Hanlon* and Rule 23(e) that apply to the approval of settlements in derivative actions.[1]

#### a. Extent of discovery completed and stage of the proceedings

Extensive formal discovery has not yet been completed in this case; however, "formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  Here, the parties were well informed in making the decision to settle.  *See* Mot. 16-17.  For example, the parties had already gone through a motion to dismiss; Birmingham had prepared an amended complaint; the parties participated in informal conferences regarding the facts of the case and their perceived strengths and weakness; Birmingham reviewed and analyzed documents Netflix produced in response to its books and records demand; and the parties submitted briefs regarding Birmingham's motion to compel the production of certain documents.  Mot. 16-17.  Accordingly, the Court finds that this factor weighs in favor of approval.

#### b. Strength of Plaintiff's case, and costs, risks, and delay of trial and appeal

In assessing "the costs, risks, and delay of trial and appeal," Fed R. Civ. P. 23(e)(2)(C)(i), courts in the Ninth Circuit evaluate "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation." *Hanlon*, 150 F.3d at 1026.

Here, Birmingham faced significant obstacles in this case, including the need to prevail on future motions to dismiss and for summary judgment, as "the odds of winning [a] derivative

---

[1] The Court does not consider some factors, such as whether "the class representatives and class counsel have adequately represented the class," Fed. R. Civ. P. 23(e)(2)(A), as these factors pertain only to class actions and do not apply here.

1    lawsuit [a]re extremely small," and "[e]ven if it had gone to trial, derivative lawsuits are rarely

2    successful." *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Indeed,

3    Birmingham's derivative complaint was dismissed with leave to amend for failure to adequately

4    plead involvement by a majority of Netflix's Board of Directors, and Birmingham recognizes that

5    continued litigation would have been complex, costly, and of substantial duration. Mot. 14-15,

6    17-18. The Settlement, therefore, "eliminates these and other risks of continued litigation,

7    including the very real risk of no recovery after several years of litigation." *Wixon v. Wyndham*

8    *Resort Dev. Corp.*, No. C 07-02361 JSW, 2010 WL 3630124, at *3 (N.D. Cal. Sept. 14, 2010)

9    (internal quotation marks omitted). Accordingly, this factor weighs in favor of approval.

10                          *c.  Settlement amount*

11         To evaluate the adequacy of the settlement amount in light of the case's risks, "courts

12   primarily consider plaintiffs' expected recovery balanced against the value of the settlement

13   offer." *In re Tableware*, 484 F. Supp. 2d at 1080. As set forth above, the Settlement does not

14   include a monetary component, except for purposes of compensating Plaintiff's counsel for fees

15   and expenses, and providing Birmingham an incentive award. The Settlement does, however,

16   implement several corporate governance reforms, and these reforms represent a substantial benefit

17   to Netflix as they directly address the allegations made in the Complaint that Defendants made or

18   caused Netflix to make false and misleading statements related to its executive compensation and

19   bonuses in its proxy materials. Mot. 12-13. Indeed, courts have recognized that "strong corporate

20   governance is fundamental to the economic well-being and success of a corporation," and

21   "corporate governance reforms such as those achieved here provide valuable benefits to public

22   companies." *In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA(JCS), 2008 WL

23   5382544, at *3 (N.D. Cal. Dec. 22, 2008); *see, e.g.*, *Graham on Behalf of Leap Wireless Int'l, Inc.*

24   *v. Hutcheson*, No. 08 CV 0246 MMA (NLS), 2010 WL 11484313, at *3 (S.D. Cal. Sept. 22, 2010)

25   (finding new and revised corporate governance policies addressing alleged wrongful conduct

26   conferred substantial benefit). Accordingly, this factor weighs in favor of approval.

27                          *d.  Terms of attorneys' fees and supplemental agreements*

28         Next, the Court must consider "the terms of any proposed award of attorney's fees," and

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1  "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(iii)-

2  (iv).  As discussed in more detail below, the Court finds that the proposed award of attorneys' fees

3  is reasonable, and there are no supplemental agreements.  Accordingly, this factor weighs in favor

4  of approval.

5                                     *e.  Counsel's experience and views*

6          The Court also considers "the experience and views of counsel."  *Hanlon*, 150 F. 3d at

7  1026.  Here, Plaintiff's counsel has extensive experience and skill in these types of cases, and

8  negotiated this Settlement at arm's length with Defendants' experienced and well-informed

9  counsel.  Mot. 18; Laughlin Decl. ¶¶ 36-37.  That counsel advocates in favor of settlement weighs

10  in favor of approval.  *See Free Range Content, Inc. v. Google, LLC*, No. 14-CV-02329-BLF, 2019

11  WL 1299504, at *7 (N.D. Cal. Mar. 21, 2019) ("Class counsel's views that the settlement is a

12  good one is entitled to significant weight."); *Wixon*, 2010 WL 3630124, at *3.  Accordingly, this

13  factor weighs in favor of approval.

14                                     *f.  Reactions to the Settlement*

15          The shareholders have been given notice and an opportunity to be heard, and to date

16  neither the Court nor the parties have received any objection to the Settlement.  *See* ECF 85.  In

17  shareholder derivative suits, there is a strong presumption that the terms of a proposed settlement

18  are favorable in the absence of a large number of objections.  *See Wells Fargo*, 2020 WL 1786159,

19  at *5.  "That presumption is further enhanced where not one sophisticated institutional investor

20  objected to the Proposed Settlement."  *Id.* (internal quotation marks omitted).  Accordingly, this

21  factor weighs in favor of approval.

22                                            *   *   *

23          Balancing the relevant factors, the Court finds the Settlement is fair and reasonable under

24  Rule 23(e) and *Hanlon.*

25      **C.**    **Conclusion**

26          For the foregoing reasons, and after considering the record as a whole, the Court finds that

27  notice of the proposed settlement was adequate, the Settlement was not the result of collusion, and

28  the Settlement is fair, adequate, and reasonable.  Accordingly, the Court GRANTS Plaintiff's

1    Motion for Final Approval of Settlement.

2    **III.    MOTION FOR ATTORNEYS FEES, COSTS, AND INCENTIVE AWARD**

3         Birmingham seek an award of attorneys' fees and costs up to $800,000, and an incentive

4    award of $10,000 for Birmingham.

5         **A.    Attorneys' Fees**

6              **1.    Legal standard**

7         Under federal law, "a court may grant fees and expenses to derivative counsel when the

8    derivative suit creates a common fund or confers a substantial corporate benefit." *Wells Fargo*,

9    2020 WL 1786159, at *5; *In re Rambus Inc. Derivative Litig.*, No. C 06-3513 JF (HRL), 2009 WL

10   166689, at *3 (N.D. Cal. Jan. 20, 2009) ("Attorneys who prosecute a shareholder derivative action

11   that confers 'substantial benefit' on the corporation are entitled to an award of attorneys' fees."

12   (citing *Mills v. Elec. Auto–Life Co.*, 396 U.S. 375 (1970)). "The benefit conferred need not be

13   monetary; however, it must be substantial in the sense that its value to the interested class or the

14   corporation is immediately discernible rather than speculative in character." *Feuer v. Thompson*,

15   No. 10-CV-00279 YGR, 2013 WL 2950667, at *2 (N.D. Cal. June 14, 2013) (brackets and

16   internal quotation marks omitted).

17        Because there is no common fund, the Court will use the lodestar method to determine the

18   reasonableness of Birmingham's fee request. *See Wehlage v. Evergreen at Arvin LLC*, No. 4:10-

19   CV-05839-CW, 2012 WL 4755371, at *2 (N.D. Cal. Oct. 4, 2012) ("The Court will use the

20   lodestar-multiplier method as the primary method for analyzing this fee request, as there is no

21   common fund."). Under the lodestar method, attorneys' fees are "calculated by multiplying the

22   number of hours the prevailing party reasonably expended on the litigation (as supported by

23   adequate documentation) by a reasonable hourly rate for the region and for the experience of the

24   lawyer." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). This

25   amount may be increased or decreased by a multiplier that reflects factors such as "the quality of

26   representation, the benefit obtained for the class, the complexity and novelty of the issues

27   presented, and the risk of nonpayment." *Id.* at 942. "The lodestar cross-check calculation need

28   entail neither mathematical precision nor bean counting," and courts "may rely on summaries

United States District Court
Northern District of California

submitted by the attorneys and need not review actual billing records." *Covillo v. Specialtys Cafe*, No. C-11-00594-DMR, 2014 WL 954516, at *6 (N.D. Cal. Mar. 6, 2014) (internal quotation marks and citation omitted).

Additionally, a court may adjust the lodestar amount upon consideration of twelve factors set forth in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975), *abrogated on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992). These factors include the following:

> (1) the time and labor required, (2) the novelty and difficulty of the question involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Bay Area Painters & Tapers Pension Tr. Fund v. Delta City Drywall*, No. C 10-1043 JSW (JL), 2011 WL 13243837, at *5 (N.D. Cal. Mar. 15, 2011) (citing *Kerr*, 526 F.2d at 69). When determining whether to adjust fees, "[t]he district court should discuss only those *Kerr* factors that are relevant to the court's decision." *Id.* (internal quotation marks omitted) (quoting *D'Emanuele v. Montgomery Ward & Co.*, 904 F.2d 1379, 1386 (9th Cir. 1990)).

### 2. Discussion

The Settlement resulted in the implementation of corporate governance reforms, and "[c]ourts have recognized that corporate governance reforms provide valuable benefits to corporations and their shareholders." *Wixon v. Wyndham Resort Dev. Corp.*, Case No. 07–CV–02361 JSW, 2010 WL 3630124 (N.D.Cal. Sep.14, 2010); *accord Feuer*, 2013 WL 2950667, at *2. The Court, therefore, finds that an award of attorneys' fees is warranted under the substantial benefit theory. Having concluded that Plaintiff's counsel is entitled to an award of attorneys' fees and expenses, the Court must now determine an appropriate award. Here, Birmingham seeks $784,756.97 in attorneys' fees for 893 hours of work and a 1.14 multiplier. Mot. 22-23.

United States District Court
Northern District of California

*a. Reasonableness of hourly rate*

When determining an attorney's reasonable hourly rate, courts weigh the "experience, skill, and reputation of the attorney requesting fees," and compare the requested rates to prevailing market rates of the relevant community. *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986), *op. am. on denial of reh'g*, 808 F.2d 1373 (9th Cir. 1987); *see also Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). The relevant community is typically the forum in which the district court sits. *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 979 (9th Cir. 2008). Here, the relevant community is the Northern District of California. To determine the prevailing market rate, courts may rely on attorney affidavits as well as "decisions by other courts awarding similar rates for work in the same geographical area by attorneys with comparable levels of experience." *Trujillo v. Orozco*, No. 5:17-cv-00566-EJD, 2018 WL 1142311, at *2 (N.D. Cal. Mar. 2, 2018); *see also United Steelworkers of Am. v. Phelps Dodge Corp*., 896 F.2d 403, 407 (9th Cir. 1990).

Plaintiff's counsel submitted a detailed itemization of attorneys' fees and costs. *See* Laughlin Decl. ¶ 43. The hourly rates for the attorneys and staff at Scott + Scott Attorneys at Law LLP range from $875 to $1,150 per hour for partners, $575 to $750 per hour for associates, and are $395 per hour for legal secretaries and paralegals. Laughlin Decl. ¶ 43. These rates are reasonable and comparable to the fees generally charged by attorneys, paralegals, and legal secretaries with similar experience, ability, and reputation for work on similar matters in this judicial district. *See, e.g.*, *Wells Fargo*, 2020 WL 1786159, at *12 (finding reasonable hourly rates ranging from $560 to $1,075 for partners or of counsel attorneys and $250 to $660 for associates); *Hefler v. Wells Fargo & Co*., No. 16-CV-05479-JST, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018) (finding reasonable hourly rates ranging from $650 to $1,250 for partners or senior counsel, from $400 to $650 for associates, and from $245 to $350 for paralegals, given blended hourly rate of $406); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig*., No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (finding reasonable hourly rates of $275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals, given blended hourly rate of $529).

United States District Court
Northern District of California

### b. Reasonableness of hours

The Court next considers the reasonableness of the hours expended.  A court cannot "uncritically" accept a plaintiff's representations; rather, it must assess the reasonableness of the hours requested.  *Sealy, Inc. v. Easy Living, Inc*., 743 F.2d 1378, 1385 (9th Cir. 1984).  In making this determination, a court can reduce hours when documentation is inadequate, or when the requested hours are redundant, excessive, or unnecessary.  *Hensley v. Eckerhart,* 461 U.S. 424, 433-34 (1983).  The moving party bears the burden of providing relevant documentation.  *Id.* at 433.  Upon examining the documentation, a court should then exclude from the initial lodestar calculation any hours that are not reasonably expended.  *Id.* at 434.

Here, Plaintiff's counsel has submitted an itemized list of the attorney, paralegal, and legal secretary hours spent investigating, prosecuting, and settling this action.  Plaintiff's counsel seeks compensation for 893 hours of attorney and paralegal time committed to this case.  Laughlin Decl. ¶ 45.  The Court has independently reviewed these hours and finds them to be reasonable.

### c. Lodestar multiplier

Based on the requested rates and hours, Birmingham requests a lodestar of $685,447.  Mot. 22; Laughlin Decl. ¶ 45.  Plaintiff requests a multiplier of 1.14.  Mot. 22; Laughlin Decl. ¶ 46. Here, Plaintiff's counsel undertook this case on a fully contingent basis, achieved a substantial benefit for Netflix, and committed significant financial resources to prosecuting this case without any guarantee of reimbursement.  *See* Mot. 20-21.  "It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases."  *In re Wash. Pub. Power Supply Sys. Sec. Litig*., 19 F.3d 1291, 1299 (9th Cir. 1994).  Having considered the foregoing factors, the Court concludes that a 1.14 multiplier is sufficient to compensate Plaintiff's counsel for the risks they incurred and results they achieved.  Additionally, such a multiplier is within the range of multipliers that courts have found to be acceptable in similar suits.  *See, e.g.*, *Klein v. Gordon*, No. 817CV00123ABJPRX, 2019 WL 1751839, at *4 (C.D. Cal. Feb. 12, 2019) (approving settlement resolving two derivative actions with 1.4 multiplier); *St. Louis Police Ret. Sys. v. Severson*, No. 12-CV-5086 YGR, 2014 WL 3945655, at *6 (N.D. Cal. Aug. 11, 2014) (awarding 1.5 multiplier

in shareholder derivative action).

### d. Conclusion

Accordingly, the Court multiplies the lodestar of $685,447 by the 1.14 multiplier for a total fee award of $784,756.97.  Based on the record, the Court approves an award of attorneys' fees in the amount of $784,756.97.

### B.   Litigation Expenses

Plaintiff seeks $15,243.03 in litigation expenses.  Mot. 22; Laughlin Decl. ¶ 47.  An attorney is entitled to "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client." *Harris v. Marhoefe*r, 24 F.3d 16, 19 (9th Cir. 1994) (internal quotation marks and citation omitted).  Plaintiff's counsel has submitted an itemized list of expenses by category of expense incurred. *See* Laughlin Decl. ¶ 47.  The Court has reviewed the list and finds the expenses reasonably.  Accordingly, the Court approves an award in the requested amount of $15,243.03.

### C.   Incentive Award

Birmingham requests an incentive award in the amount of $10,000.  Service or incentive awards "are discretionary . . . and are intended to compensate . . . representatives for work done on behalf of the [action], to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp*., 563 F.3d 948, 958-59 (9th Cir. 2009); *see Staton v. Boeing Co*., 327 F.3d 938, 977 (9th Cir. 2003) ("[N]amed plaintiffs . . . are eligible for reasonable incentive payments.").  "Incentive awards typically range from $2,000 to $10,000." *Bellinghausen v. Tractor Supply Co*., 306 F.R.D. 245, 267 (N.D. Cal. 2015).

Here, Birmingham expended considerable effort throughout the litigation, including by carefully reviewing the books and records demand, the Settlement, the Complaint, and the briefing. Mot. 23; Laughlin Decl. ¶ 50.  Birmingham was additionally kept apprised of other developments in the investigation and lawsuit. *See* Mot. 23; Laughlin Decl. ¶ 50.  Given the time and assistance Birmingham put into the case and the success of the recovery, the Court finds that an incentive award in the amount of $10,000 is reasonable. *See, e.g.*, *Wells Fargo*, 2020 WL

United States District Court
Northern District of California

1786159, at *18 (approving service award of $25,000 for each co-lead plaintiff in derivative

action); *Hughes v. Microsoft Corp.*, No. C93-0178C, 2001 WL 34089697, at *12 (W.D. Wash.

Mar. 26, 2001) (approving service awards of $7,500; $25,000; and $40,000).

Accordingly, the Court concludes that the requested $10,000 for Birmingham is

appropriate in this case.

**IV.   ORDER**

For the reasons discussed above, Plaintiff's Motion for Final Approval of Settlement and

Approval of Agreed-Upon Attorneys' Fees and Expenses and Plaintiff's Incentive Award is

GRANTED.  Plaintiff is awarded attorneys' fees in the amount of $784,756.97; costs and

expenses in the amount of $15,243.03; and an incentive award for Plaintiff in the amount of

$10,000.

Without affecting the finality of this Order and accompanying Judgment in any way, the

Court retains jurisdiction over (1) implementation and enforcement of the Settlement until each

and every act agreed to be performed by the parties pursuant to the Settlement has been

performed; (2) any other actions necessary to conclude the Settlement and to administer,

effectuate, interpret, and monitor compliance with the provisions of the Settlement; (3) all parties

to this action for the purpose of implementing and enforcing the Settlement; and (4) disputes

relating to attorneys' fees that are raised within 90 days from the date of this Order.

**IT IS SO ORDERED.**

Dated: July 6, 2020

_____

BETH LABSON FREEMAN
United States District Judge